UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

HAITHEM ASSAD,

*Plaintiff,*

*v.* Case No. 2:26-cv-2173

MILWAUKEE COUNTY, TYLER BLANKENHEIM, LAVALLE MORGAN, KONNER KRALOVETZ, CHRISTOPHER SWANSON II, BRANDY LESTER, CITY OF MILWAUKEE, DEANGELO CAMPBELL, JEREMY SROMALLA, & IRELISSE PAGAN,

*Defendants.*

---

**COMPLAINT**

---

Plaintiff Haithem Assad, by his attorneys, Strang Bradley, LLC, for his complaint against Defendants Milwaukee County, Tyler Blankenheim, Lavalle Morgan, Konner Kralovetz, Christopher Swanson II, Brandy Lester, City of Milwaukee, DeAngelo Campbell, Jeremy Sromalla, and Irelisse Pagan, states:

**INTRODUCTION**

1. On July 9, 2026, Milwaukee County Sheriff's deputies went to Haithem Assad's home to serve a temporary restraining order. They had no warrant and, as they acknowledged on their own body cameras, no authority to enter. When Assad would not open the door and told the deputies to leave, the deputies walked into his fenced yard, had Irelisse Pagan—the petitioner, who had moved out of the home eight months

earlier—open a window and tear down the blinds, and pointed a gun through the opening.

2. When that did not get them inside, the deputies and the Milwaukee police officers Assad had called for help told Pagan that if she could get into the house, she should call them. Then they left.

3. Minutes later, Pagan climbed through the window, called 911, and let the officers in the back door. Officers Campbell and Sromalla entered Assad's home without a warrant, without his consent, and without any exception to the warrant requirement, and arrested him inside it.

4. Assad brings this action under 42 U.S.C. § 1983 against the deputies and officers who carried out the plan, the private party who joined them, and the municipalities whose customs and practices caused the violations.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the federal claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), and over the state-law claims under 28 U.S.C. § 1367(a).

6. Venue is proper under 28 U.S.C. § 1391(b)(1)–(2). Upon information and belief, all person-Defendants reside in this judicial district, and the alleged claims occurred within this judicial district.

## PARTIES

7. Plaintiff Haithem Assad is an adult resident of Milwaukee County, Wisconsin.

8. At all relevant times, Assad owned and lived in the single-family home at 4929 North 51st Boulevard in the City and County of Milwaukee.

9. Defendant Milwaukee County is a political subdivision of the State of Wisconsin. It operates the Milwaukee County Sheriff's Office (MCSO), is or was the employer of Defendants Blankenheim, Morgan, Kralovetz, Swanson, and Lester, and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment.

10. Defendant City of Milwaukee is a political subdivision of the State of Wisconsin. It operates the Milwaukee Police Department (MPD), is or was the employer of Defendants Campbell and Sromalla and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment.

11. At all relevant times, Defendants Tyler Blankenheim, Lavalle Morgan, Konner Kralovetz, and Christopher Swanson II were deputy sheriffs employed by the Milwaukee County Sheriff's Office.

12. Defendant Brandy Lester was, at all relevant times, a captain employed by the Milwaukee County Sheriff's Office and the supervisor of the deputies named above.

13. Defendants DeAngelo Campbell and Jeremy Sromalla were, at all relevant times, police officers employed by the Milwaukee Police Department and assigned to District Seven.

14. Blankenheim, Morgan, Kralovetz, Swanson, Lester, Campbell, and Sromalla are referred to collectively as the "Officer Defendants." At all times relevant to

this action, each of them was on duty, acted under color of state law, ordinance, and regulation, and acted within the scope of his or her employment with Milwaukee County or the City of Milwaukee.

15. Defendant Irelisse Pagan is an adult resident of Milwaukee County, Wisconsin. Pagan is a private person. As alleged below, she acted jointly with, at the direction of, and in agreement with the Officer Defendants, and she therefore acted under color of state law for purposes of 42 U.S.C. § 1983.

**FACTS**

16. On July 3, 2024, Pagan conveyed Assad's house to him by quitclaim deed, which was recorded with the Milwaukee County Register of Deeds. The deed permitted Pagan to reside at the house rent-free only until August 1, 2024.

17. Pagan stayed at the house at times after that with Assad's consent, but by her own account she moved out in November 2025 and did not live there again. By the time of this incident in July 2026, she had been out for about eight months, had no key, and had no ownership, leasehold, or possessory interest in the house.

18. On May 27, 2026, Assad's home was burglarized. He subsequently identified Pagan as being responsible. On May 29, 2026, Pagan had a vehicle containing Assad's property towed away from Assad's home. Assad reported both incidents to the Milwaukee Police Department.

19. On June 1, 2026, Pagan petitioned the Milwaukee County Circuit Court for a harassment restraining order and injunction against Assad under WIS. STAT. § 813.125 (Milwaukee County Case No. 2026CV005197). A court issued a temporary restraining

order ex parte. But the Sheriff's Office never served it, and the court dismissed the case on June 23, 2026, for lack of service and prosecution.

20. On June 26, 2026, Pagan filed a second harassment petition against Assad (Milwaukee County Case No. 2026CV006073). In it, she acknowledged that she moved out of Assad's home in November 2025 and asked that Assad be removed from the house as part of the injunction to be decided after a hearing. The court issued a temporary restraining order (the "TRO") ex parte and directed that it be served on Assad.

21. On July 9, 2026, the court convened the injunction hearing. Pagan appeared, but Assad did not because he had never been served. The court extended the hearing to July 21, 2026, to give Pagan more time to serve Assad.

22. Later that day, at about 4:05 p.m., Deputies Blankenheim and Morgan arrived at Assad's home to serve the TRO. Pagan accompanied them. The deputies had no warrant.

23. When Blankenheim and Morgan arrived at Assad's home to serve the TRO, Morgan first went around the side of the house with Pagan to try to access the garage before going to the front door to knock or ring the doorbell.

24. Assad was inside. He told the deputies through the closed door and windows that they had no warrant and should leave his property. He did not open the door or consent to anyone entering his home or yard.

25. Rather than leave, the deputies and Pagan went through the gate into Assad's enclosed yard, including the backyard, and walked around the house, trying its

windows and the garage door and looking inside. Morgan asked Pagan whether she was "planning on getting us in."

26. Pagan opened a rear kitchen window of the home from the outside. Morgan directed her to tear down the blinds hanging in the window so that he could see inside, and she did. Morgan later told his captain he had asked Pagan to pull down the blinds "so I can proceed better into that house."

27. Morgan pointed his firearm through the opened window into the home.

28. Pagan told the deputies she would climb in through the window. Morgan told her the deputies were "not climbing through," but that she "could have did this and then opened the door for us from the inside."

29. Through the window, Morgan told Assad that the deputies were there for a "removal," that he should gather his things, and—when Assad protested that they had no warrant—"No, sir, we don't have a warrant. I do have a court order."

30. Morgan told the other deputies, "If we get in the house, we're going to remove him. There's two MPD and three of us, we should be able to get him up out of there."

31. The deputies knew they had no authority to enter. Morgan acknowledged on camera that "we cannot force our way in on a civil matter and we don't have a warrant," and that Assad "has to voluntarily open up the door, or she has to be able to get us into the residence."

32. The deputies also knew that Pagan did not live at the Assad's home. Morgan told his captain that Pagan had not been there in at least a month and a half,

that Assad's "name is on the deed, so the house is his house," and that Assad had changed the locks. The deputies nonetheless discussed whether Pagan could "just go in and unlock it" for them.

33. At 4:14 p.m., Assad called 911 and reported that Sheriff's deputies were breaking into his house with the help of a woman who had opened his window in front of them. Assad called again minutes later to report that he had told them repeatedly to get off his property, and that he wanted a sergeant.

34. The Milwaukee Police Department dispatched Officers Campbell and Sromalla to Assad's home. They arrived at approximately 4:30 p.m. Deputies Kralovetz and Swanson also arrived.

35. Morgan reported the situation to Captain Lester by telephone, including that Pagan had not been at Assad's home in at least a month and a half, that Assad owned the house, that a rear window had been opened, and that Pagan had pulled down the blinds at his request.

36. Lester did not direct the deputies to leave. She instructed that they could not force their way in on a civil matter, but that if Pagan "has keys" or "a locksmith or something for us to get in, that would be great." Lester then came to the scene.

37. Rather than protect Assad's home, Campbell and Sromalla joined the deputies at Assad's windows and spent roughly twenty minutes trying to talk him into coming to the door. Assad told them to leave.

38. Standing at the windows, the officers and deputies discussed that if Assad came to a window, he would "technically" be served, would then be violating the order, and "we would have every reason to go in there."

39. After failing to get into Assad's home, the deputies and officers settled on a plan with Pagan: she would get into the home, then call them. As Campbell wrote in his official report: "MCSO and MPD Officers advised PAGAN that if she was able to gain entry into the residence, she should contact police or deputies so officers could attempt to serve the Temporary Restraining Order."

40. The deputies' body-worn cameras captured the plan. As they prepared to leave, Morgan told Pagan she should "get a locksmith or something and try to get back into your house," that "at that time you might have police or somebody around you," and that "if somebody comes in the door open somehow and we're here, that changes the story." Pagan answered, "Okay, no problem. I appreciate you guys so much."

41. The purpose of the plan was for Pagan to get inside Assad's house by whatever means she could, so that the Officer Defendants could then enter on the strength of her call and her presence inside, and remove Assad.

42. At about 4:49 p.m., the deputies cleared the scene and recorded the disposition as "Paper Not Served."

43. Campbell and Sromalla told Assad through the window that the deputies and Pagan were leaving and that the officers were "not gonna come in," and they left as well.

44. Pagan did not leave. Fifteen minutes later, as the Officer Defendants had told her to, she returned to the kitchen window and climbed into the house.

45. Assad called 911 and reported that Pagan had broken into his house as soon as the police and deputies left, and that she had "jumped into the house."

46. Pagan also called 911 from inside, as the Officer Defendants had instructed, and accused Assad of hitting her.

47. Campbell and Sromalla returned to Assad's home and went to the back door. Pagan opened it and let them in. As Pagan later testified, when she opened the back door "the cops were already in the back of the house."

48. Campbell and Sromalla had no warrant. Assad did not consent. Pagan had neither actual nor apparent authority to consent: the officers had been told minutes earlier that she did not live there, and they knew the only way she had gotten inside was through a window, at their suggestion. Any claimed exigency was one the Officer Defendants had themselves created by sending Pagan into Assad's home.

49. Inside, Pagan accused Assad of striking her. Assad denied it, told the officers that Pagan had broken into his house, and offered to show them surveillance video. The officers declined to look at it, arrested Assad inside his home, and took him to District Seven.

50. On July 21, 2026, after an evidentiary hearing in which Pagan testified in support of her request for a permanent restraining order, Court Commissioner Jason Mishelow dismissed Pagan's petition, stating that he was "troubled by an injunction that is brought to evict someone from a house that the petitioner has not lived in in almost

eight months," and that the petition appeared to be "an attempt to gain an upper hand in a property dispute."

51. As a result of Defendants' conduct, Assad suffered property damage and loss of liberty; and he suffered and continues to suffer severe emotional distress, fear, and humiliation.

**COUNT 1**
**Unreasonable Search and Seizure**
**Against Defendants Blankenheim, Morgan, Kralovetz, Swanson, Lester, and Pagan**

52. Plaintiff realleges the above paragraphs.

53. Assad's enclosed yard is the curtilage of his home and is protected by the Fourth Amendment to the same extent as the home itself.

54. Defendants Blankenheim, Morgan, Kralovetz, Swanson, Lester, and Pagan, acting under color of law, physically intruded on the curtilage of Assad's home and into the home itself and refused to leave—walking his enclosed yard to look into and try his windows and garage, opening a window, tearing down his blinds, and pointing a firearm through the opening—to gather information about the interior of the home and to gain entry to it, without a warrant, without consent, and without any exception to the warrant requirement.

55. The authority to serve civil process did not authorize any of this conduct.

56. Defendants also meaningfully interfered with Assad's possessory interest in his blinds and window by damaging them, without a warrant or any lawful justification.

57. Pagan was a willful participant and conspirator in joint activity with the deputies. She opened the window and tore down the blinds at their direction and for their purposes, and she thereby acted under color of law.

58. Defendants' conduct was unreasonable and violated Assad's rights under the Fourth Amendment. Defendants are thus liable under 42 U.S.C. § 1983.

59. As a direct and proximate result of Defendants Blankenheim, Morgan, Kralovetz, Swanson, Lester, and Pagan's unlawful actions, Assad suffered damages including property damage, emotional distress, invasion of privacy, and fear.

WHEREFORE, pursuant to 42 U.S.C. §§ 1983 & 1988, Plaintiff demands actual or compensatory damages against Defendants Blankenheim, Morgan, Kralovetz, Swanson, Lester, and Pagan, and, because they acted in reckless disregard for Plaintiff's rights, punitive damages, plus the costs of this action, attorneys' fees, and such other relief that the Court deems just and equitable.

**COUNT 2**
**Unreasonable Search and Seizure**
**Against Defendants Campbell, Sromalla, and Pagan**

60. Plaintiff realleges the above paragraphs.

61. Defendants Campbell, Sromalla, and Pagan, acting under color of law, entered Assad's home without a warrant, without consent, and without any exception to the warrant requirement.

62. Pagan had neither actual nor apparent authority to consent to the officers' entry, and no reasonable officer could have believed that her invitation authorized entry into Assad's home.

63. The officers cannot rely on exigency to justify the entry, because any exigency was created by their own plan to have Pagan get inside Assad's home and call them.

64. Pagan was a willful participant and conspirator in joint activity with the officers. She entered Assad's home and opened the door for them pursuant to the plan the Officer Defendants had proposed to her, and she thereby acted under color of law.

65. Defendants Campbell, Sromalla, and Pagan's conduct was unreasonable and violated Assad's rights under the Fourth Amendment. Defendants are thus liable under 42 U.S.C. § 1983.

66. As a direct and proximate result of Defendants Campbell, Sromalla, and Pagan's unlawful actions, Assad suffered damages including loss of liberty, emotional distress, invasion of privacy, humiliation, and fear.

WHEREFORE, pursuant to 42 U.S.C. §§ 1983 & 1988, Plaintiff demands actual or compensatory damages against Defendants Campbell, Sromalla, and Pagan, and, because they acted in reckless disregard for Plaintiff's rights, punitive damages, plus the costs of this action, attorneys' fees, and such other relief that the Court deems just and equitable.

**COUNT 3**
**Conspiracy to Violate Civil Rights**
**Against Defendants Blankenheim, Morgan, Kralovetz, Swanson, Lester, Campbell, Sromalla, and Pagan**

67. Plaintiff realleges the above paragraphs.

68. The Officer Defendants and Pagan reached an agreement and understanding among themselves to deprive Assad of his Fourth Amendment right to be free from unreasonable searches of, and entries into, his home.

69. The object of the agreement was for Pagan to gain entry to Assad's home by whatever means she could, and then to summon the Officer Defendants to enter the home without a warrant and remove Assad from it.

70. In furtherance of the conspiracy, Pagan opened the window and tore down the blinds; the deputies looked and pointed a firearm into the home and tried its other windows and garage; the Officer Defendants left the scene so that Pagan could get inside; Pagan climbed through the window and called 911; Pagan opened the back door for Campbell and Sromalla; and Campbell and Sromalla entered the home.

71. Each Defendant was a willful participant and conspirator in the joint activity. Pagan, though a private person, acted jointly with and under the direction of state actors and is liable under 42 U.S.C. § 1983 for the conspiracy and for the overt acts of her co-conspirators.

72. The overt acts taken in furtherance of the conspiracy deprived Assad of his Fourth Amendment rights as alleged in Counts 1 and 2.

73. As a direct and proximate result of the conspiracy, Assad suffered damages including property damage, loss of liberty, emotional distress, invasion of privacy, humiliation, and fear.

WHEREFORE, pursuant to 42 U.S.C. §§ 1983 & 1988, Plaintiff demands actual or compensatory damages, jointly and severally, against Defendants Blankenheim,

Morgan, Kralovetz, Swanson, Lester, Campbell, Sromalla, and Pagan, and, because they acted in reckless disregard for Plaintiff's rights, punitive damages, plus the costs of this action, attorneys' fees, and such other relief that the Court deems just and equitable.

**COUNT 4**
***Monell*[1] Claim**
**Against Defendant Milwaukee County**

74. Plaintiff realleges the above paragraphs.

75. The Milwaukee County Sheriff's Office serves temporary restraining orders and other civil process in Milwaukee County and classifies some of those assignments, as it did here, as a "removal."

76. On information and belief, Milwaukee County, through the Sheriff's Office, maintains a custom and practice of treating a "removal" assignment as authority to enter the respondent's home, or to cause entry to be made, and to remove the respondent, without a warrant.

77. On information and belief, Milwaukee County, through the Sheriff's Office, maintains a custom and practice of enlisting petitioners and other civilians to open, enter, or otherwise gain access to a respondent's home so that deputies may then enter. Captain Lester, a supervisory official, directed exactly that here.

78. Milwaukee County has failed to train and supervise its deputies on the limits of their authority when serving civil process, including that civil process is not a warrant; that a respondent's refusal to open the door does not authorize entry into the home or its curtilage; that deputies may not direct or encourage a private person to do

[1] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

what the deputies may not do themselves; and that a petitioner's claim to live at a residence must be verified before it is acted upon.

79. The need for such training is obvious. Deputies serve domestic-abuse temporary restraining orders at private homes every day, respondents frequently decline to open the door, and petitioners frequently claim an interest in the premises. The likelihood that untrained deputies will respond by entering, or by causing entry, without a warrant is so high that the County's failure to train amounts to deliberate indifference to the rights of the people on whom process is served.

80. The conduct alleged here was not the aberration of a single deputy. Four deputies and a captain participated openly, on their own body-worn cameras, and no one intervened or objected. The deputies described the approach as routine.

81. On information and belief, Milwaukee County has not disciplined, retrained, or otherwise corrected any of the deputies involved, and has thereby ratified their conduct.

82. The customs, practices, and failures to train and supervise described above were the moving force behind the violations of Assad's Fourth Amendment rights alleged in Counts 1 and 3.

83. As a direct and proximate result, Assad suffered the damages alleged above.

WHEREFORE, pursuant to 42 U.S.C. §§ 1983 & 1988, Plaintiff demands actual or compensatory damages against Defendant Milwaukee County, plus the costs of this action, attorneys' fees, and such other relief that the Court deems just and equitable.

**COUNT 5**
***Monell* Claim**
**Against Defendant City of Milwaukee**

84. Plaintiff realleges the above paragraphs.

85. On information and belief, the City of Milwaukee, through the Milwaukee Police Department, maintains a custom and practice of advising a civilian who claims a right to premises occupied by another person to gain entry by whatever means she can and then to call police, so that officers may enter the premises on the strength of the civilian's call and presence, without a warrant.

86. Campbell and Sromalla followed that practice here, and Campbell memorialized it in his official report without any apparent concern that it was improper.

87. A Milwaukee Police Department supervisor reviewed and approved that report and forwarded it to the District Attorney without correction. On information and belief, no supervisor identified the advice as improper, and no officer was disciplined, retrained, or corrected because of it. The City has thereby ratified the conduct.

88. The City of Milwaukee has failed to train and supervise its officers on the limits of third-party consent to enter a home, including that a person's bare claim to live at a residence does not establish authority to consent when the circumstances known to the officers contradict it; that officers may not direct or encourage a private person to enter a home so that officers may follow; and that officers may not rely on an exigency of their own making.

89. The need for such training is obvious. Milwaukee police officers respond daily to disputes between current and former cohabitants over who may be present in a

residence. The likelihood that untrained officers will resolve those disputes by encouraging one party to force entry and then entering themselves is so high that the City's failure to train amounts to deliberate indifference to the Fourth Amendment rights of residents.

90. The customs, practices, ratification, and failures to train and supervise described above were the moving force behind the violations of Assad's Fourth Amendment rights alleged in Counts 2 and 3.

91. As a direct and proximate result, Assad suffered the damages alleged above.

WHEREFORE, pursuant to 42 U.S.C. §§ 1983 & 1988, Plaintiff demands actual or compensatory damages against Defendant City of Milwaukee, plus the costs of this action, attorneys' fees, and such other relief that the Court deems just and equitable.

**COUNT 6**
**Indemnification Claim**
**Against Defendants Milwaukee County and City of Milwaukee**

92. Plaintiff realleges the above paragraphs.

93. Wisconsin law, Wis. Stat. § 895.46, requires public entities to pay any tort judgment for damages for which employees are liable, for acts within the scope of their employment.

94. At all times relevant to this action, Defendants Blankenheim, Morgan, Kralovetz, Swanson, and Lester engaged in the conduct complained of while they were on duty and in the course and scope of their employment with Milwaukee County.

95. At all times relevant to this action, Defendants Campbell and Sromalla engaged in the conduct complained of while they were on duty and in the course and scope of their employment with the City of Milwaukee.

WHEREFORE, Plaintiff asks this Court to find that Milwaukee County is liable to defend this action against Defendants Blankenheim, Morgan, Kralovetz, Swanson, and Lester and to satisfy any judgment entered against them, and that the City of Milwaukee is liable to defend this action against Defendants Campbell and Sromalla and to satisfy any judgment entered against them, by virtue of Wis. Stat. § 895.46.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. P. 38(b), on all issues so triable.

Respectfully submitted,

Dated: November 23, 2026,

STRANG BRADLEY, LLC
Attorneys for Plaintiff

/s/ John H. Bradley
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724
STRANG BRADLEY, LLC
613 Williamson St., Suite 204
Madison, WI 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com
William@StrangBradley.com